**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KENNETH CHANG a/k/a KAN ZHANG,<br><br>*Plaintiff*,<br><br>v.<br><br>THE BANK OF NEW YORK MELLON CORPORATION, et al.,<br><br>*Defendants*. | Civil Action No. 17-11061<br><br>OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of Defendants The Bank of New York Mellon Corporation's, The Bank of New York Mellon's ("BNY Mellon"), BNY IHC, LLC's, and Technology Services Group, Inc.'s ("TSG") (collectively "Defendants") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, ECF No. 102. Plaintiff Kenneth Chang a/k/a Kan Zhang ("Plaintiff") opposes the Motion. ECF No. 112. For the reasons explained below, the Motion is **GRANTED**.

## I. FACTUAL BACKGROUND[1]

This matter arises out of BNY Mellon's termination of Plaintiff's employment on July 10, 2017. Def. SOMF ¶ 8. Plaintiff alleges that his termination was in retaliation for concerns he had raised about Defendants' data storage procedures during the course of his employment.

---

[1] Unless otherwise indicated, the Court draws the following facts from Defendants' Statement of Material Facts ("Def. SOMF"), ECF No. 105, and Plaintiff's Responsive Statement of Facts ("Pl. RSOMF"), ECF No. 112.1.

1

### A. Plaintiff's Employment and Defendants' Outsourcing of Data Backup Functions

Plaintiff began his employment with TSG, an indirect wholly owned subsidiary of BNY Mellon, on October 28, 1996. Id. ¶¶ 2, 10. Plaintiff joined TSG as a "Unix system administrator." In this role, Plaintiff's job responsibilities included, among other things, managing computer server setups and providing computers with storage space. Id. ¶¶ 10-11. Plaintiff held this role for approximately five years. Id. ¶ 12.

In or around September 2001, Plaintiff became a "data backup administrator," where his job responsibilities included, among other things, maintaining BNY Mellon's data on media for long-term storage, performing disaster recovery, and providing a data backup plan, including off-site data storage in case the primary storage operation got damaged. Id. ¶ 13. As a data backup administrator, Plaintiff held various "internal" job titles such as Senior Systems Programmer, Software Systems Specialist, and Specialist Systems Engineer/Programmer. Id. ¶¶ 24-25. Plaintiff described his various internal job titles as promotions with a salary increase, but his core job responsibilities, which included ensuring proper data backup and management, remained the same throughout. Id.

Plaintiff was part of TSG's United States operations, while many of his peers worked overseas. Id. ¶ 19. His group was comprised of approximately 20 members, separated into U.S. and Indian teams. Id. ¶ 20. Of the U.S. team, only two others were BNY Mellon employees and the rest were consultants. Id. Plaintiff had no formal management responsibilities on his team. Rather, his role was on the technical side of the operation, and he interfaced directly with users to provide solutions for the business-side of BNY Mellon. Id. ¶ 26. From 2001 onward, Plaintiff had several different managers including William Telford, Timothy Gladson ("Gladson"), and Joseph Wholey ("Wholey"). Id. ¶¶ 14-17. Wholey was hired by TSG in 2016 as Senior Group

Manager for Infrastructure Operations within TSG's Enterprise Storage Services ("ESS") group. Wholey managed Plaintiff until Plaintiff's termination in 2017. Id. ¶ 17.

In 2015, prior to Wholey's hiring, BNY Mellon had independently performed a risk analysis and review of their electronic backup infrastructure and the related support staff. Id. ¶ 30. Following this review, BNY Mellon decided to assess the commercial and technical benefits of outsourcing data backup and support functions to a third-party vendor. Id. ¶ 31. Plaintiff was aware of discussions about outsourcing for "many years" but was not involved in the process of selecting a third-party vendor. Id. ¶ 32; see also Declaration of August W. Heckman, III ("Heckman Decl."), Ex. D, Deposition of Kenneth Chang ("Chang Dep. Tr.") at 128:11-25, ECF No. 104.4. The same year, the entire ESS team held a meeting to discuss the outsourcing of certain job functions to a third-party vendor. Def. SOMF ¶ 33. Plaintiff and his colleagues were in attendance at this meeting. Id.

In December 2016, BNY Mellon engaged IBM to take over its data backup functions. Id. ¶ 55. On or about January 4, 2017, BNY Mellon commenced its transition program to outsource its data backup functions to IBM. Id. From January to June of 2017, Plaintiff, under the supervision of Wholey, and his fellow team members assisted in a "knowledge transfer" of BNY Mellon's then-existing data backup and management systems to IBM. Id. ¶ 70. At the time, Plaintiff's team was comprised of approximately 20 members, 16 of whom were located overseas. On that team, Plaintiff was the only U.S.-based TSG employee because the others were "contractors" or "consultants." Id. ¶ 72. The goal of the project was to launch Backup as a Service

3

("BaaS"), which would be fully operated and maintained by IBM. BaaS would fully assume the data backup functions for BNY Mellon. Id. ¶ 76.

On May 12, 2017, Wholey emailed BNY Mellon's Human Resources Department ("HR") to inquire about the process of terminating Plaintiff's employment. Id. ¶ 73. In this email, Wholey stated "[a]s a result of an outsource initiative we are implementing, I have one [full time employee] who becomes redundant on June 1st. I am looking for your guidance as to how I begin the employee separation process." Id. ¶ 74.

On June 2, 2017, BNY Mellon launched BaaS. Id. ¶ 76. The consultant team members on the U.S. team went back to their companies or were reassigned to other accounts, and Plaintiff was the last remaining full-time U.S. employee in his group at TSG. Id. ¶ 77. Paul Corbett ("Corbett") was the only other remaining full-time employee of the data backup team, and he was located in the United Kingdom. Id. ¶ 72.

Ultimately, on July 10, 2017, Mr. Wholey called Plaintiff to notify him that his position had been eliminated and that his employment was terminated. Id. ¶ 96. Plaintiff remained on the payroll until September 4, 2017 and was offered a severance package, which he refused. Id. ¶¶ 99-102. Plaintiff's termination happened outside Defendants' typical quarterly time period for dismissals. Id. ¶ 92. Meanwhile, Corbett was chosen to transition to the "BaaS Governance Team," which would provide oversight and governance for BaaS. Id. ¶ 94.

### B. Plaintiff's Alleged Whistleblowing Activity

At different times throughout the course of his employment, Plaintiff voiced concerns about Defendants' data retention practices.

Plaintiff alleges, without record evidence, that he first voiced concerns about Defendants' limited data storage system in 2010. Compl. ¶¶ 31-33. According to his own deposition testimony, Plaintiff had communicated concerns about the loss of client data to his then-supervisor Mr.

4

Gladson as early as 2015. See Pl. Ex. A, Chang Dep. Tr. at 229:14-231:9. Plaintiff stated at this time he noticed they were having trouble recovering old data records and the situation did not improve after he flagged the issue. Id.

Plaintiff also raised concerns about Defendants' data retention practices in two annual employee questionnaires. Each year, BNY Mellon employees are required to fill out and submit an online, electronic Code of Conduct Questionnaire providing responses to various questions about compliance and potential conflicts of interest. DSOMF ¶ 35. In his 2016 questionnaire, Plaintiff answered in the affirmative when asked if he was aware of a "significant business decision in which risk, compliance or regulatory concerns" was not appropriately considered. Id. ¶ 57. In providing greater detail, Plaintiff stated, "For over 12 months before 2016, ESS had many backup storage devices that were filled to 100%. The new data won't be able to storage such devices any more [sic] and data retention policies were not met." Id.; see also Heckman Decl., Ex. M at BNY_000013, ECF No. 104.13 ("2016 Code of Conduct Questionnaire"). Similarly, in his 2017 questionnaire, Plaintiff indicated he "[had] voiced concerns on the situation where we are running out of data backup capacity for some internal/external customer data." DSOMF ¶ 89; see also Heckman Decl., Ex. N at BNY_000017, ECF No. 104.14 ("2017 Code of Conduct Questionnaire"). The 2017 questionnaire was submitted after IBM went live with BaaS and assumed full backup responsibilities for BNY Mellon. DSOMF ¶ 88. Consistent with the review

process for these forms, Wholey noted on the 2017 questionnaire that a "Strategic Initiative is underway (BaaS) to address these concerns." Id. ¶ 89.

Additionally, Plaintiff emailed two senior TSG officers, John Weir and Jim Basedow, about the alleged mishandling of data backup operations at BNY Melon on June 28, 2017. In this email, Plaintiff writes:

> [W]riting this note to let you know that you may want to look into the current Backup service out sourcing plan and progress to see if this work is heading to the right direction that it was intended to go to. We have the service provider, IBM team took over the operations which is fine and I am fully supported. But in my opinion some level of managements are dumping the problems and blames to a 3rd party vendor at the cost of BNYM's best interests. If you need more details on such issues, I am willing to spend 10-20 mins to explain to you more.

Pl. Ex. F at BNY_000206-207, ECF No. 112.7. Plaintiff was informed of the decision to terminate his employment the following month. Def. SOMF ¶ 96.

## II. PROCEDURAL HISTORY

On September 28, 2017, Plaintiff initiated this action in the Superior Court of New Jersey, Hudson County. See Complaint, ECF No. 1.1. The Complaint alleges two causes of action against Defendants: (1) a violation of New Jersey's Conscientious Employee Protection Act, N.J.S.A. § 34:19-1, et seq. ("CEPA") and (2) termination in violation of public policy pursuant to Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980). Id.

On November 3, 2017, Defendants removed this action, invoking the Court's diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. Notice of Removal, ECF No. 1.[2] After discovery, Defendants filed the instant Motion for Summary Judgment on August 26, 2020.

---

[2] Plaintiff is a citizen of New Jersey. Notice of Removal ¶ 9. Defendants are citizens of both Delaware and New York. Id. ¶¶ 11-14.

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), the Court should grant summary judgment when there is no genuine issue as to any material fact "that would permit a reasonable jury to find for the nonmoving party," Boyle v. Cnty. of Allegheny Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citation omitted), and when "the moving party is entitled to judgment as a matter of law," Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In deciding a motion for summary judgment, the Court does not "weigh the evidence to determine the truth of the matter," but rather assesses "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-52 (1986).

The Court construes all facts and inferences in the light most favorable to the non-moving party, see Boyle, 139 F.3d at 393, and the moving party bears the initial burden of demonstrating that no genuine issue of material fact remains, see Celotex Corp., 477 U.S. at 322-23.  If the moving party meets its burden, the non-moving party must present evidence demonstrating a genuine issue of material fact for trial.  See Anderson, 477 U.S. at 248-49.  A non-moving party's "[u]nsupported allegations, subjective beliefs, or argument" cannot alone overcome a properly supported summary judgment motion.  V.C. by Costello v. Target Corp., 2020 WL 1864611, at *4 (D.N.J. Apr. 14, 2020).  If the non-moving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" summary judgment is warranted because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 59 n.5 (3d Cir. 1992) (internal quotation marks and citation omitted).

IV. ANALYSIS

Plaintiff's Complaint contains both a CEPA claim and a claim under New Jersey common law. The Court must first determine whether both claims can proceed before it resolves whether genuine issues of material fact preclude summary judgment.

### A. The CEPA Waiver Provision Bars Plaintiff's Parallel Pierce Claim

As an initial matter, Defendants argue that Plaintiff's CEPA claim bars his Pierce claim because both claims are based on the same conduct. The Court agrees.

The CEPA provides that "the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." N.J.S.A. § 34:19-8. This waiver provision precludes a plaintiff from bringing both a CEPA claim and a claim under New Jersey common law when both claims are based on the same conduct. See Hrinuk v. Pub. Serv. Elec. & Gas Co., No. 14-988, 2018 WL 621292, at *2 (D.N.J. Jan. 30, 2018). Rather, a plaintiff must "elect" between pursuing a remedy under the CEPA or common law. Id. (citing Rossi v. Vericare Mgmt., Inc., 13-6884, 2016 WL 6892075, at *3 (D.N.J. Nov. 22, 2016)). A plaintiff must elect a cause of action "after discovery is complete, and [he] has been provided the opportunity to fully explore the facts at issue." Westberry v. State Operated Sch. Dist. of Newark, No. 15-07998, 2017 WL 2216395, at *5 (D.N.J. May 19, 2017).

Here, it is undisputed that Plaintiff's CEPA and Pierce claims are based on the same conduct. See Compl. ¶¶ 72-88. Moreover, in Opposition to the instant Motion, Plaintiff has only argued in support of his claim under the CEPA and has thereby appeared to elect it as his preferred

cause of action.³  Therefore, the Court finds that Plaintiff's Pierce claim is barred by the CEPA and is dismissed.

> **B. Plaintiff's CEPA Claim Fails Because the Record Fails to Provide Any Evidence Showing a Causal Connection Between His Complaints and His Termination and Fails to Provide Any Evidence of Pretext.**

The CEPA protects employees from retaliation by their employers for reporting suspected violations of law or public policy.  New Jersey courts apply the familiar McDonnell–Douglas burden-shifting framework in evaluating claims under the CEPA for summary judgment.  See Tinio v. Saint Joseph Reg'l Med. Ctr., No. 13-829, 2015 WL 1530912, at *10 (D.N.J. Apr. 6, 2015); see also Schlichtig v. Inacom Corp., 271 F. Supp. 2d 597, 611 (D.N.J. 2003).  Under this framework, a plaintiff must first establish a prima facie CEPA case by demonstrating "that (1) he reasonably believed that his employer's conduct was violating a law or rule or regulation promulgated pursuant to law, (2) he objected to the conduct, (3) an adverse employment action was taken against him, and (4) a causal connection exists between the whistleblowing activity and the adverse employment action."  Robles v. U.S. Env't Universal Servs., Inc., 469 F. App'x 104, 107 (3d Cir. 2012).  Next, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for taking the employment action.  If the employer produces such a reason, it is then the employee's burden to demonstrate this legitimate reason is just a pretext. Tinio, 2015 WL 1530912, at *10 (citing Klein v. Univ. of Med. and Dentistry, 377 N.J. Super. 28 (App. Div. 2005)).

Here, the Court concludes that Plaintiff has failed to provide any evidence establishing the causality requirement of a prima facie case.  Moreover, even if Plaintiff were able to establish a

---

³ Plaintiff does not make any arguments or statements in response to Defendants' argument that his Pierce claim is barred by the CEPA's waiver provision.  "Where an issue of fact or law is raised in an opening brief, but is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant."  Lawlor v. ESPN Scouts, LLC, No. 10-05886, 2011 WL 675215, at *2 (D.N.J. Feb. 16, 2011).  Therefore, the Court considers this argument waived by Plaintiff.

prima facie case, Plaintiff has further failed to provide any evidence that demonstrates Defendants' legitimate, nondiscriminatory reason for his firing—that his role became redundant after outsourcing the data backup function—is just a pretext for retaliation.

### i. Causal Connection

Assuming Plaintiff's conduct amounted to whistleblowing activity, Plaintiff must still demonstrate a causal connection between that activity and his adverse employment action. "To demonstrate causation, a plaintiff must show that the retaliatory discrimination was more likely than not a determinative factor in the decision by establishing a factual nexus between his protected activity under the CEPA and the alleged retaliatory conduct through either direct or circumstantial evidence." Kerrigan v. Otsuka Am. Pharm., Inc., 706 F. App'x 769, 771-72 (3d Cir. 2017) (internal citations omitted). Temporal proximity, i.e., timing that is "unusually suggestive," may give rise to an inference of causation. Id. However, even absent temporal proximity, the Court must still consider whether "the proffered evidence, looked at as a whole, may suffice to raise the inference" of causation to survive summary judgment. Id.

As an initial matter, there is no temporal proximity in the instant case that gives rise to an inference of causation. Plaintiff alleges that he began voicing concerns about Defendants' data retention practices as early as 2010, seven years before he was terminated. These 2010 complaints were made verbally and are uncorroborated beyond his own assertions. Apart from his own deposition testimony, the earliest piece of record evidence showing he raised these concerns was his 2016 questionnaire, which was submitted on June 9, 2016. 2016 Code of Conduct Questionnaire at BNY_000015; see also DSOMF ¶¶ 56-57. This is over a year before he was terminated on July 11, 2017. The lapse of this much time between raising his concerns and his ultimate termination is insufficient to establish an inference of causation. See Bobo v. Wildwood Pub. Sch. Bd. of Educ., No. 13-5007, 2014 WL 7339461, at *14 (D.N.J. Dec. 23, 2014) (dismissing

10

a CEPA claim and noting an "absence of temporal proximity" when plaintiff's alleged whistleblowing activity covered a nearly six-and-a-half-year period before he was suspended and then terminated); see also LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) (finding "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment"); cf. Marracco v. Kuder, No. 08–713, 2008 WL 4192064, at *7 & n.6 (D.N.J. Sept. 9, 2008) (noting temporal proximity was undisputed when plaintiff alleged "that the adverse employment occurred a few days after she voiced her objection to defendant").

In the absence of unusually suggestive temporal proximity, the Court must look to whether the record contains other evidence that raises an inference of causation. It does not here. Causation may be inferred "from the circumstances surrounding the employment action including . . . inconsistencies or contradictions in the employer's proffered legitimate reasons for its action," and "circumstantial evidence of a pattern of antagonism following plaintiff's protected conduct." Cohen v. BH Media Grp., Inc., 419 F. Supp. 3d 831, 856 (D.N.J. 2019) (citing Robles, 469 F. App'x at 107-08). The circumstances leading up to Plaintiff's termination do not suggest any pattern of antagonism, let alone one that emerged because he raised concerns about data storage over multiple years. For example, Plaintiff did not experience any reduction in compensation, nor did he suffer any adverse consequences effecting his title, duties, or job function. See Kerrigan, 706 F. App'x at 772 (finding no causation when plaintiff failed to adduce evidence that his negative performance reviews, reduction in compensation, and ultimate termination were because he reported multiple problems over a six-month period). In fact, Plaintiff contends that over the course of this period he still received "promotions with a salary increase." See Pl. RSOMF ¶ 25.[4]

---

[4] Plaintiff raises vague allegations that he was passed over for a position as an IBM liaison, but these allegations are inconsequential. See Pl. Opp. at 9; Compl. ¶¶ 61, 62. Plaintiff has pointed to no evidence that suggests this decision

Moreover, Plaintiff's overall performance rating increased from "below expectations" in 2015 to "achieved expectations" in 2016. DSOMF ¶¶ 61-69.[5] This record cannot demonstrate a pattern of antagonism after he raised concerns about data storage.

Plaintiff argues that causation can be shown from Wholey's reaction to his June 28, 2017 email in which he reached out to two senior TSG officers (Weir and Basedow) to note they "may want to look into the current Backup service out sourcing [sic] plan." Heckman Decl., Ex. F at BNY_000206-207. Following that email, Wholey contacted HR, Weir, and Basedow about the outsourcing plan and noted that Plaintiff's communication with upper management was "inappropriate." Pl. Ex. I at BNY_000205, ECF No. 112.10. However, this argument is belied by the timeline of events: Plaintiff sent this June 2017 email after the decision to terminate him had already been made. The record shows that Wholey reached out to HR as early as May 12, 2017 to begin Plaintiff's employment separation process. See Heckman Decl., Ex. O, ECF No. 104.15.

Therefore, a reasonable jury could not find that retaliatory discrimination was more likely than not a determinative factor for Plaintiff's termination.

### ii. Pretext

Moreover, Plaintiff cannot meet his burden of proving that Defendants' proffered reason for his termination—that his job became redundant after the IBM outsourcing—was a pretext for retaliation. To prove Defendants' proffered reason for Plaintiff's termination was pretextual,

---

was tied to his alleged whistleblowing conduct. Indeed, Plaintiff testified that he did not even apply for such a role. Chang Dep. Tr. at 409:15-410:5. Moreover, he does not dispute other deposition testimony that establishes his skill sets did not align with such a position. See Pl. SOMF ¶¶ 81-83.

[5] Plaintiff alleges that he received a negative performance evaluation in 2015 following his decision to raise his concerns. Compl ¶ 45. However, he admits that this performance evaluation had no adverse effect on his compensation, title, duties, or job function. Pl. RSOMF ¶ 48. Therefore, a negative performance rating such as this cannot constitute an adverse employment action under the CEPA. See Smith v. Twp. of E. Greenwich, 519 F. Supp. 2d 493, 511 (D.N.J. 2007) (explaining an adverse employment action must be one "to have either impacted on the employee's compensation or rank or be virtually equivalent to discharge").

Plaintiff "must demonstrate such weaknesses, implausabilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action" that a reasonable jury could infer the employer did not truly act for that reason. Kolb v. Burns, 320 N.J. Super. 467, 478 (App. Div. 1999) (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994)).

There is no competent record evidence from which a reasonable jury could find that Plaintiff was terminated for any reason other than the IBM outsourcing. Defendants have consistently asserted that the reason for Plaintiff's termination was that his role became redundant after they outsourced his job functions to IBM, and the record reflects that consistency. See Tinio, 2015 WL 1530912, at *9 (explaining consistency in reasoning weighs against a finding of pretext). The record confirms BNY Mellon's years-long initiative to outsource its data preservation functions. Moreover, it confirms Plaintiff's full awareness of this initiative. For example, following Plaintiff's comments on his 2016 questionnaire about data retention concerns, management provided return comments that a "[s]trategic initiative [was] underway (BaaS) to address these concerns." 2016 Code of Conduct Questionnaire at BNY_000015. Plaintiff admits that the origins of BNY Mellon's potential outsourcing of the data backup function can be traced as far back as 2001. Pl. RSOMF ¶ 52. Indeed, Plaintiff and his colleagues attended a meeting to discuss outsourcing of certain job functions to a third party in 2015. Id. ¶ 33

Moreover, the record is clear that Wholey had contacted HR to initiate the process of Plaintiff's termination in May 2017 in anticipation of the imminent outsourcing of his function. See Heckman Decl., Ex. O. Wholey stated in that email that the reason for his termination was because Plaintiff's role "becomes redundant on June 1st" when outsourcing was expected to begin. Id. There is not an iota of evidence in the record that contradicts that reason beyond Plaintiff's

13

own speculative assertions.[6]  For example, in his Responsive Statement of Facts, Plaintiff states he "disputes the causation between IBM's outsourcing and that his position had been eliminated," but does not cite or point to any piece of record evidence in support.  Pl. RSOMF ¶ 8.  Additionally, Plaintiff cites in passing an email he sent after his termination in which he states his belief that he was laid off because he voiced concerns to management.  See Pl. Ex. N at BNY_000000090, ECF No. 112.15.  However, Plaintiff's subjective beliefs and bald assertions are insufficient to create a genuine dispute of material fact.  See, e.g., Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995) (explaining "a plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case").  In the absence of concrete record evidence to the contrary, the Court need not credit Plaintiff's subjective beliefs about the reasons for his termination.  See Acumed LLC v. Advanced Surgical Servs., 561 F.3d 199, 228 (3d Cir.2009) ("[S]peculation and conjecture may not defeat a motion for summary judgment.") (internal citation omitted).

Therefore, the Court finds that a reasonable jury could not find that Defendants' proffered legitimate reason for Plaintiff's termination was mere pretext.

### V. Conclusion

For the reasons contained herein, Defendants' Motion for Summary Judgment is **GRANTED**.  An appropriate order accompanies this Opinion.

---

[6] Plaintiff also suggests that pretext or causation can be inferred from the fact that his termination happened outside the typical quarterly period for dismissals.  However, the Court fails to see how this has any bearing on either pretext or causation.  That Plaintiff was terminated following the launch of the BaaS program is entirely consistent with Defendants' proffered reason for his termination.  Moreover, while Plaintiff was notified of his termination in July, he was allowed to stay on the payroll until September, which further undermines Plaintiff's arguments that his termination was "quick" following his June 2017 email.  See Pl. Opp. at 11.

**Dated**: March 31, 2021

                                         */s Madeline Cox Arleo*
                                         **HON. MADELINE COX ARLEO**
                                         **UNITED STATES DISTRICT JUDGE**